IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

JENNIFER MOSCHETTI                )
                                               )
            Plaintiff,          )
                                               )
v.                               )    Civil Action No.: 3:23cv389
                                             )
NIXON PEABODY, LLP,           )
Serve:    Stephen D. Zubiago, Esq.    )
            CEO and Managing Partner    )
            Nixon Peabody, LLP        )
            Exchange Place            )
            53 State Street            )
            Boston, MA 02109-2835     )
                                             )
            Defendant.        )

## <u>COMPLAINT</u>

Jennifer Moschetti, by counsel, states as follows as her Complaint against Nixon Peabody, LLP ("Nixon Peabody").

### NATURE OF ACTION

1.    This case, like Moschetti's separate case against certain current and former Virginia employees[1], is about protecting whistleblowers. When Jennifer Moschetti, who at the time was the lead Virginia Office of the Inspector General ("OSIG") investigator into OSIG's investigation of the Virginia Parole Board (the "Board"), submitted a detailed 14-page draft report describing numerous examples of alleged violations of policy and law by the Board, she set in motion a chain of events that exposed serious Board misconduct. However, she became the scapegoat for having shined a light on this misconduct. She was investigated, fired, and defamed by various governmental employees.

---

[1] *See Moschetti v. Office of the Inspector General, et al.*, 3:22cv24 (E.D.Va.)

2.      What happened next, though, was arguably even worse.  *After* she was fired and *after* she was initially defamed for publicly for exposing Board misconduct, she was separately attacked through a calculated, government-coordinated, and partisan effort that was intentionally designed to make her the sole public focus of the scandal relating to Board misconduct – rather than, of course, the Board itself.  To this end, in an entirely party-driven effort, the then-Governor's Office, with the help of likeminded legislators from the Governor's political party, procured an "investigation" into the Board scandal by Nixon Peabody that was undeniably designed to try to professionally discredit Moschetti and to blame *her* for misconduct related to the Board.

3.      And the investigation so tried – falsely and baselessly stating such things as (i) "It is ***most likely*** that the objectivity of . . . Moschetti . .. in the VPB Martin matter ***was impaired by bias*** and that ***this bias likely had an impact*** on the OSIG Parole Board Report" (emphasis added); (ii) Moschetti had a "***personal bias***" as part of the investigation; and (iii) she was "***motivated to see Mr. Martin returned to prison*** and that ***such motivation likely impacted the investigation and report***." Such allegations might have even held up were it not for a later investigation conducted by the current Office of the Attorney General ("OAG").  As a result of this OAG investigation, Moschetti learned *for the first time* that not only were Nixon Peabody's statements about her false, but that, back at the time Nixon Peabody made its false allegations against her, it *knew they were false, had a high degree of awareness of their probable falseness, and/or made them with reckless disregard for the truth.*

4.      Moschetti now files this lawsuit for numerous violations of federal and state law in order to vindicate her rights and to restore her good name.

2

## JURISDICTION AND VENUE

5.     This Court has federal subject matter jurisdiction over the federal claims in this case pursuant to 28 U.S.C. § 1331. It has pendent and supplemental jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367.

6.     Also, if necessary, this Court has diversity jurisdiction over the state law claims in this case under 28 U.S.C. § 1332 since Moschetti is a citizen of Virginia and, upon information and belief, none of Nixon Peabody's partners are citizens of Virginia.

7.     Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claims occurred.

## PARTIES

8.     Moschetti is a resident of Virginia and a former employee of the Commonwealth of Virginia, specifically at OSIG, where she worked under Michael Westfall and others.

9.     Nixon Peabody, LLP is a Global-100 law firm with its headquarters based in Boston, Massachusetts.  It is a limited liability partnership organized under the laws of Massachusetts, and, upon information and belief, none of its equity partners or owners are citizens of Virginia. It is sued individually and, where appropriate, as a state actor acting under color of law.

## OTHER IMPORTANT ACTORS

10.     Michael Westfall is, and at all relevant times herein has been, the State Inspector General for OSIG.

11.     Brian Moran is the former Secretary of Public Safety and Homeland Security for the Commonwealth of Virginia.

12.     Clark Mercer is the former Chief of Staff for the former Governor of Virginia, Ralph Northam.

13.     Ralph Northam is the former Governor of Virginia.

## FACTS

### A.    BACKGROUND.

14.     Moschetti worked as an investigator for OSIG from January 2020 through March 22, 2021.

15.     Even though her period of employment was brief,  Moschetti was well-regarded at OSIG. She received a "Major Contributor" performance rating in her annual evaluation, and in that same document, was called a "person of integrity," a "detail-oriented investigator," a "valued member of the Hotline team," and someone whose "work is far superior to her time at OSIG would suggest." Moschetti's evaluation also stated that she "***is consistently fair and balanced*** when interacting with external 'customers.'" (emphasis added).

### B.    THE PAROLE BOARD INVESTIGATION.

16.     On May 4, 2020, Westfall assigned Moschetti to investigate multiple complaints of fraud and abuse involving the Board.

17.     Moschetti then faithfully investigated such allegations – conducting numerous interviews, reviewing numerous documents, and evaluating policies, regulations and statutes -- and completed several detailed reports. In her annual evaluation, OSIG specifically praised Moschetti for her work on the Board investigation, stating her reports were "comprehensive and exhaustive," her work was "meticulous," and her "final reports [were] of the highest quality."

18.     At all times during the Board investigation, Westfall supervised and collaborated with Moschetti.  ***At no time*** did Westfall, or anyone else at OSIG, indicate, directly or indirectly, to Moschetti that her investigation into the Parole was biased, agenda-driven, or otherwise lacking in objectivity. To the contrary, all of Moschetti's protocols and plans for her investigation – including her proposed witness interview questions – were approved by OSIG.

19.     Westfall certified as "substantiated" Moschetti's findings of numerous violations of policy and law by members of the Board related to the Board's decision to grant parole to the following offenders (names redacted) DLB, IC, RDG, TXG, DMR, PS, and DKS.

20.     Westfall further certified as "substantiated" Moschetti's findings of violations of policy and law by members of the Board in granting the parole of an additional offender: VLM.  These findings were detailed as an executive summarized 10-page report. That report was submitted by Westfall to the Office of the Attorney General where it was then redacted and reduced to a six-page report.

**C.     EFFORTS BY MORAN AND MERCER TO PRESSURE THE OSIG'S INVESTIGATION.**

21.     During the pendency of OSIG's investigation, Moran and Mercer were consistently keeping tabs on Westfall and, in doing so, subtly and not-so-subtly trying to exert influence over the OSIG investigation.

22.     On May 4, 2020, for example, Westfall e-mailed Mercer and Moran to notify them about various complaints OSIG had received about the Board and that OSIG would be investigating those complaints.  Moran, in turn, responded by hinting that his office had already exonerated the Board. He wrote: "Thank you for letting us know.  ***We've conducted a similar internal review.  Having OSIG confirm its findings will***

5

***be significant to instill public confidence in the PB's decision making***."
(emphasis added).

23.     The not-so-secret implication of Moran's statement was "Hey, we've cleared the Board of any wrongdoing, so you should too."  Moran omitted, however, that his internal investigation had not asked such important questions as whether the Board had violated either Va. Code § 53.1-136, regarding notifying Commonwealth's Attorney's 21 days prior to an inmate's release on parole, or Va. Code § 53.-139, requiring the Board to keep minutes of its meetings.

24.     Just four days later, on May 8, 2020, Mercer separately reached out to Westfall and tried to suggest that he [Westfall] should prioritize speed over an in-depth investigation.  He wrote: "Hearing there may be preliminary results of this inquiry.  Might have been sent my way already – though can you send me if there are such results?" Baffled, Westfall replied: We just ***initiated*** this inquiry and are not close to having even preliminary results."  (emphasis added). Mercer then gave Westfall his cell phone number and asked him to call him.

25.     Mercer then reached out to Westfall again about a month later about the status of the OSIG report.  As Westfall explained in an internal e-mail from June 9, 2020: "I need it [the Martin report] ASAP as the Chief of Staff has contacted me about this."

26.     Moran and his Deputy (Nicky Zamostny) also were preemptively accusing OSIG of bias – even institutional bias – as part of its investigation.  Zamostny in particular believed – without evidence – that OSIG was biased as a whole simply because it was an agency made up of former law enforcement officials.  She also believed – again without evidence – that OSIG was intentionally dragging its feet on the investigation in order to make the Board look bad.

**C.      THE LEAK OF THE VLM REPORT AND BACKLASH FROM THE GOVERNOR'S OFFICE**

27.      The final report on VLM was submitted to various persons, including Mercer, on or about July 28, 2020. Soon thereafter, however, an unredacted version of the VLM report was leaked to the public, prompting numerous news stories about the report.

28.      On August 14, 2020, shortly after the leak of the six-page VLM report, Moschetti and Westfall were summoned to the Office of the Governor, where they both were interrogated by various members of the Northam administration regarding her reports, investigations, and findings.  At that meeting were Mercer, Moran, Westfall, and others, including Zamostny.

29.      For over an hour, Moschetti and Westfall were berated and hostilely cross-examined about the findings in the VLM report. Moran even openly questioned whether OSIG had the authority to investigate the Board, stating, in relevant part, "So you think [state law] gives you the ability to review any agency's policies, and whether or not they're following it?"[2] When Westfall answered affirmatively, Moran then scoffed at his response, stating "Really?  Wow."

30.      Moran then turned to the substance of the VLM report.  Looking directly at Moschetti, he said: "Jennifer, I guess *you're the one that wrote this*?"  Westfall immediately took the focus off of Moschetti and said he would address any concerns with the report.

31.      Westfall's gesture, however, did nothing to lessen the attacks by Moran, Mercer, and Zamostny.  Among other things, the three individuals repeatedly complained

---

[2]      https://richmond.com/news/state-and-regional/audio-exclusive-in-closed-door-meeting-governors-office-ripped-inspector-generals-parole-board-investigation-as/article_0cef39cf-8945-5c9a-b403-c3d0965994c3.html (viewed on January 13, 2022).

about the negative (but true) background information about VLM that was included in the report.  Instead, they said, the report *should have* included all of the allegedly good things that VLM had done since he had been incarcerated.  Indeed, at one point, Mercer said there were "dozens and dozens of pages" in VLM's file showing that he had a "sparkling" reputation within the Virginia corrections system.  He said that this *positive* information is what had actually led the Board to grant parole to VLM, and, thus, it should have been included.

32.     Zamostny went even further, saying "I'm just going to put this out there . . the fact that this is the <u>way</u> it [the report] was written also speaks to the <u>way</u> that it was investigated and brings into question for me whether you were all were <u>objective and unbiased</u> in your report."  (emphasis added). She continued:  "I think that this is prejudicial, and it sets the tone for the rest of the report."

33.     Westfall pushed back, saying the VLM report had been vetted by OSIG's counsel (i.e., its representative from the Virginia Attorney General's office) and that counsel had approved the inclusion of all of the information in the Report.

34.     Moran did not appear to be satisfied with this answer.  To the contrary, he said he could not believe the report had been written as it had been knowing that it might get to the press.  He complained that Westfall should have known what a "disserve it would be on the Board <u>and us</u>" (emphasis added) for the OSIG to write the report the way it did.  Moran said:  **"I don't know how you can defend that, Mike**."

35.     Moran also disputed OSIG's findings in the VLM report, stating "I don't think they've violated any policies, and this thing is entirely prejudicial."

36.     During the meeting, Moschetti announced to those in attendance that a more comprehensive report regarding VLM existed; however, Westfall refused to release

the longer report that he had previously approved report to the administration.

**D.    MOSCHETTI'S REASONABLE CONCERNS ABOUT WRONGDOING.**

37.    The August 14, 2020 meeting was intended to intimidate – and ***did*** intimidate -- Westfall and the OSIG investigators who were tasked with making fact findings related to members of the Board.  Indeed, under questioning from the Governor's team, Westfall actually promised that OSIG would ***not*** look into any new complaints about the Board, but instead, would forward them to the Governor's Office.

38.    As well, following the meeting, Westfall spoke to Moschetti and explained that he might lose his job for the work product regarding the VLM investigation. This apprehension by her supervisor placed Moschetti in substantial fear of losing her job as the primary investigator on the Board matter.

39.    Indeed, Moschetti had long been apprehensive about both her livelihood -- and even her safety -- due to her work on the Board investigations – especially her VLM report.

40.    She became particularly concerned after her June 15, 2020 draft of the VLM report was sanitized and shortened as the result of certain discussions between OSIG and its Agency representative from the Office of the Attorney General.

41.    Among the key items removed from Moschetti's June 15, 2020 draft report were her discussions of potential criminal wrongdoing by the Board and various details showing that the then-Board Chair, in deciding whether to grant VLM parole, had gone beyond the simple question of whether parole was justified and, instead, had delved into whether VLM had actually committed the crime for which he was convicted. For example, Moschetti's draft said: "During interviews with VPB employees, Bennett often verbally stated that she believed Martin was innocent and employees felt that this belief was the

main deciding factor of his release."[3]  This detail, of course, not only showed the use of improper considerations in parole decisions, it also cast doubt as to whether VLM's good behavior while incarcerated was the main reason for his grant of parole.

42.     These actions and others caused Moschetti to be worried that OSIG, the Attorney General's Office, the Governor's Office, or some combination of all three, were trying to cover up the seriousness of the misconduct allegations against the Board.  She was also concerned that these governmental entities might even be engaging in improper conduct themselves by sanitizing her reports and leaving out important details.

43.     Moschetti's concerns and apprehensions during this time were reasonable. As already noted above, as early as May 8, 2020 (i.e., the very beginning of Moschetti's investigation), the Governor's Office, through Mercer, reached out to Westfall to inquire about the status of the investigation and whether any preliminary results had been reached. The Board too was resistant to OSIG's investigation of it, specifically asking OSIG in May 2020 to identify the legal basis upon which it claimed to have the authority to conduct its investigation.

E.      MOSCHETTI'S RESPONSE TO HER CONCERNS ABOUT WRONGDOING.

44.     Because of her apprehensions, which had existed throughout the entire summer and fall of 2020, Moschetti decided to speak out.  First, she spoke with a former law enforcement officer about the VLM report.  She also provided him with copies of some of her Board reports, including the draft of her VLM report. At the time, Moschetti told the

---

[3] https://apnews.com/article/richmond-virginia-027a0ca4c989fb2aedf8b2e9f0516640 (visited on May 6, 2022).

former law enforcement official "In case I get 'Epsteined,' here's the truth."[4]

45. Around the same time, Moschetti also provided a copy of the draft VLM report to an active law enforcement officer with the City of Richmond Police Department ("RPD"). In doing so, she again reiterated her safety concerns. In her text message to the officer, Moschetti wrote "In case I get 'Epsteined,' here's the truth."

46. At no time did Moschetti tell either the former law enforcement official or the RPD law enforcement official to make any of the reports public or to distribute them to the media. She provided the information to these individuals, however, because she want to let someone with law enforcement connections know that there were far more details about the Board's decision to grant parole to VLM – a decision which was at odds with its own prior decisions (at least 20 of them) **and** the recent recommendation of the parole examiner who interviewed VLM right before the Board's 2020 favorable decision – and that the Board's actions as to other offenders had violated law and policy.

47. Moschetti also shared some of the information from her Board reports with the FBI, again, after seeing how things had been handled with the VLM report, out of concern that wrongdoing by the Board was likely to be covered up by OSIG and/or the Governor's Office.

**F. THE FEBRUARY DISCLOSURE OF BOARD REPORTS.**

48. In February 2021, the full 14-page VLM report from June 15, 2020 was leaked to the media. As noted above, the 14-page report was an earlier draft of Moschetti's

---

[4] "Epsteined" is a reference to the disgraced financier Jeffrey Epstein, who was found unresponsive in his federal jail cell on August 10, 2019 (and later declared dead) and whose untimely death has been the subject of rumors and conspiracy theories. https://www.foxnews.com/us/jeffrey-epstein-death-suicide-murder (visited on January 13, 2022).

work product.

49.     The VLM report contained substantial facts and findings of serious wrongdoing by members of the Board that had been previously omitted at the direction of the Office of the Attorney General.

50.     The VLM report also contained key facts about the mindset of the then-Board chair.  The report, for example, said the then-Chair had said the case against VLM was "built on lies" and had tried to marshal support of his release.[5]  The report also said that the the-Chair had said the Board "unfortunately had no choice" but to contact the victims.

51.     Moschetti did not leak the VLM report – or any other reports or work product – to the media, either at that time or at any other time.

**G.     MOSCHETTI BECOMES THE SCAPEGOAT FOR HER WHISTLEBLOWING ACTIONS.**

52.     Following the leak of the 14-page report and other documents, Westfall publicly announced that the Virginia State Police would be conducting an investigation into the person who leaked the documents.

53.     Westfall himself also came under intense scrutiny and pressure from the Governor's office about why such important reports were never presented to the Governor. In a February 26, 2021 letter to him from Rita Davis, then Counsel to the Governor, Ms. Davis pulled no punches about the reports:

> ***It cannot be stated strongly enough how important these reports are.***  Media reports claim that draft reports prepared by the OSIG ***allege criminal conduct by past and current members of the Virginia Parole Board***. ***Allegations of such criminal conduct are extremely serious and troubling***.  Such allegations are especially troubling since they were never presented to the Office of the Governor.  In

---

[5]     https://www.virginiamercury.com/2021/02/26/the-laws-did-not-matter-leaked-reports-show-pattern-of-parole-board-violations/ (visited on January 13, 2020).

order to consider appropriate action, it is imperative that the Office of the Governor obtain copies of these draft reports immediately.

(Emphasis added).

54.     Since she had already cooperated with Federal Law Enforcement, since she was the author of the report that was leaked, since she *knew* that the more detailed report had been shortened by OSIG to remove important facts and details, and since she had disclosed copies of some of her reports to a former law enforcement official and a current law enforcement officer, Moschetti now feared she was going to be used as a scapegoat for the controversy surrounding the Board's conduct.  She was especially concerned that she would be retaliated against because of the previous hostile in-person meeting with senior leadership of the Northam administration and Westfall's comments that he believed he was also going to be fired as a result of the investigation of the Board.

55.     On Wednesday, March 3, 2021, Moschetti released a partial copy of her file to the leadership of the General Assembly, which is as an Appropriate Authority under the Virginia Whistle Blower Act, and identified herself anonymously through her counsel as a Whistle Blower. The release contained the full reports of DLB, IC, RDG, TXG, DMR, PS, DKS and VLM, as well as other facts and circumstances detailing additional violations by the Board.

56.     On Friday, March 5, 2021, Moschetti received a visit at her home from Katrina Goodman, Chief of Investigations and Rich Scholl, Investigations Manager, both employed by OSIG.  At that time, they hand-delivered a letter authored by Corrine Louden placing Moschetti on pre-disciplinary leave from her job with pay pending an investigation into alleged misconduct. Her work laptop was seized at that time, as was her employee access card.

13

57. On March 5, 2021, Moschetti, through her then counsel, sent a letter to Westfall and Deputy Inspector General Louden unmasking herself as a Whistle Blower and demanding retraction of the threat of "pre-disciplinary" leave for "alleged misconduct."

58. Then, on March 8, 2021, Moschetti filed a Petition For Declaratory Judgment and Mandamus in the City of Richmond Circuit Court asking the Court to declare her a Whistle Blower under the Virginia Whistle Blower Protection Act and to award her various forms of relief.

59. Notwithstanding her disclosures to the FBI, to a former law enforcement official, to a current RPD law enforcement officer, and to the General Assembly and notwithstanding the filing of her Petition, Moschetti was fired by OSIG on March 22, 2021.

**H.    MOSCHETTI ALSO BECOMES A PUBLIC TARGET FOR DISPARAGING REMARKS.**

60. Even beyond losing her job because of her whistleblowing activities, Moschetti also became "Public Enemy Number 1" for the then-Governor's Office and his staff when it came to publicly addressing the Board crisis.

61. In a news conference on March 9, 2021, the day immediately after Moschetti filed her Whistle Blower Petition, Mercer openly disparaged her when talking about the August 14, 2020 meeting. He said "We went into that meeting ***thinking*** that there was bias and there was lack of objectivity," and "We left that meeting ***knowing*** that there was ***bias and a lack of objectivity in that report***." (the July 28, 2020 report).

62. At the same press conference, Mercer also specifically disparaged Moschetti's legal petition, saying her whistleblower claims were "a political ploy to hurt the Northam administration and other state leaders."

63. Likewise, in a radio interview that occurred on or about March 9th or 10th, 2020, Moran echoed Mercer's "bias" allegations, stating that Moschetti's report was

14

"biased" and that she would not hold up under "cross examination."

64.    Moran's and Mercer's comments were in line with partisan talking points that were circulated among the then-Governor's office just two weeks earlier – mainly seeking to attack the whole leak as a Republican-based ploy or an attack on the entire concept of parole.

65.    None of the above statements or their negative implications are true. Unlike Mercer's and Moran's false accusations, Moschetti did ***not*** conduct her investigation or draft any of her reports with bias or a lack of objectivity.  Indeed, everything she wrote – even the leaked reports – ***was vetted by Westfall and others***, and her entire plan of investigation (including her interview questions) -- every step -- ***was vetted and approved by OSIG***.  Moschetti had no hidden (or open) agenda as to her investigation; she had no pre-conceived notions about any members of the Board, and she had no personal opinions one way or the other about whether any of the offenders at issue were guilty of the crimes for which they were convicted or whether they should or should not have been granted parole.

66.    Nor did Moschetti file her Petition for whistle blower relief as a "political ploy" to hurt the Governor or his administration. Indeed, Mercer's comment in this regard might be one of the most ridiculous statements anyone has ever said about Moschetti.  To be clear: Moschetti filed her Petition because she was, in fact, seeking legal whistleblower protections.  Nothing more.  Nothing less.

67.    Finally, Mercer and Moran's statements imply that Moschetti lacked integrity, trust, honesty, respect, and ethical behavior when she conducted her Board investigations.  This is not true.  Rather, at all times, she was fair, ethical, honest, respectful, accountable, and trusting when she investigated the Board and when she

reached her conclusions about its conduct.

I.     **THE GOVERNOR'S OFFICE GOES INTO DAMAGE CONTROL MODE AND COORDINATES THE PASSAGE OF THE RESULTS-DRIVEN HOUSE BILL (H.B.1800 2021) THAT ULTIMATELY AUTHORIZES THE NIXON PEABODY INVESTIGATION.**

68.     As a direct and immediate response to the leak of Parole Board documents and Moschetti's Whistleblower Petition, the Governor's Office, with the direct assistant of the OAG, drafted a bill that would call for the hiring of an "independent" investigator to investigate OSIG vis-à-vis the Parole Board.

69.     The language that was first proposed for the bill called for an investigation into OSIG's "policies, process, and procedures employed during its 2020 and 2021 investigations of the Virginia Parole Board."

70.     Such language was soon amended, however, so that the investigation would focus solely on the Vincent Martin matter. Moran and Mercer specifically participated in this drafting/editing process.

71.     Talking points about the bill were circulated among various Democratic legislators, and at least one of them offered his thoughts. Specifically, in an April 6, 2021 e-mail from former Delegate Mark Levine to Missy Neff, the Governor's Legislative Director, Delegate Levine proposed adding language to the Governor's statement about the bill that would emphasize the overall *substance* of what OSIG had been investigating in the first place, not just the process through which it reached its decision. His rationale was straightforward and non-partisan:

> To me, the goal is not just to determining [sic] how OSIG made or changed its reports but whether the *underlying facts alleged therein are accurate or not.*

If we investigate that, we are showing Virginia that we aren't just "investigating the investigators."  We are also investigating to see to what extent OSIG had it right or didn't have it right in the first place, i.e., we are investigating the underlying actions taken by members of the parole board who, it has been alleged at least in the initial OSIG report, to have committed seriously illegal conduct.

What I don't want is the accuracy of the allegedly illegal conduct to be glossed over . . .and we only investigate those who dared to possibly call attention to illegality.

Now I happen to believe – as I know does Clark Mercer and Rita Davis – that Adrienne Bennett did not do anything illegal (She may have sent an unwise email or two but did not do anything illegal . . . nothing on the order of the horrible things she has been alleged to have done in the initial OSIG report).  And that's a good thing.  So this investigation will exonerate Judge Bennett while at the same time not lead us to the political charge that we are only investigating the investigation . . .and not the underlying conduct.

And after all, wouldn't justice be served if we find out, not only how the OSIG investigated, but whether they were right in the first place?  Or in the second place? If the 6-page report is accurate and the 13-page report is inaccurate, wouldn't it help Virginia and the Governor to know that fact from an independent investigator?  Or if neither report is accurate?

April 6, 2021 e-mail (italics in original).

72.    Neff forwarded Levine's e-mail to Rita Davis, the Governor's General Counsel, who then forwarded the e-mail to Mercer.  Mercer responded: "This is such a pain in the butt."  He begrudgingly relented, however, and said: "What he has inserted is the point of looking at why the allegations were dropped so I'm fine with it.  Rita – pls do call [Levine] if you can."

73.    The very next day, on April 7, 2021, the Virginia General Assembly passed the following as H.B. 1800 to authorize the investigation.  It stated:

"I. The appropriation in this item includes up to $250,000 from the general fund in the first year to conduct an independent, third-party investigation of the Office of the State Inspector General's policies, process, and procedures employed during its investigation of the Virginia Parole Board's handling of the Vincent Martin matter. The Office of the Attorney General, in consultation with the Office of the Governor, the Speaker of the House of

Delegates, and the President pro tempore of the Senate, is directed to secure an investigator to conduct the investigation. The Office of the State Inspector General and the Virginia Parole Board shall cooperate fully in the investigation. Records that are confidential under federal or state law shall be maintained as confidential by the Office of State Inspector General and shall not be further disclosed, except as required by law. Records that are confidential under state law shall be accessible to the investigator; records that are confidential under federal law shall be made available to the extent permitted by federal law. All confidential records provided to the investigator shall be maintained as confidential by the investigator and shall not be further disclosed, except as required by law. Notwithstanding any other provision of law, investigative notes, draft reports, and other correspondence generated during the course of this investigation are exempt from disclosure under the Virginia Freedom of Information Act, section 2.2-3700 et seq. of the Code of Virginia. No later than June 15, 2021, the investigator shall prepare a written report to the Governor, Speaker, Majority Leader and Minority Leader of the House of Delegates, President pro tempore, Majority Leader and Minority Leader of the Senate with the investigator's findings and any recommendations."

H.B. 1800 (2021).

74.     Roundly criticized by Republicans as simply authorizing an "investigation of the investigators," the bill passed along a strict party-line vote: 55 to 45 in the House of Delegates and 21-19 in the Senate. Not one Virginia Republican legislator voted for the investigation in this form.

**J.     NIXON PEABODY ISSUES ITS REPORT AND FALSELY BLAMES MOSCHETTI FOR THE OSIG'S ALLEGEDLY BIASED INVESTIGATION.**

75.     On or about June 14, 2021, Nixon Peabody issued its report concerning the policies, process, and procedures employed by OSIG in its investigation of the Parole Board's handling of the Vincent Martin matter. A copy of the report is attached hereto as **Exhibit A**.

76.     In keeping with the strictly limited scope of its investigation, Nixon Peabody made no findings about whether the work performed by Moschetti actually uncovered any wrongdoing by the Parole Board. *See* Exhibit A, page 3. As the report explained:

> "**We are not tasked with determining whether or not OSIG's determination that it had jurisdiction to investigate the VPB was appropriate.  Nor were we tasked with determining whether or not OSIG"s specific findings and recommendations were appropriate.**"

**Exhibit A**, page 25.

     77.    Instead, Nixon Peabody devoted an inordinate amount of its attention as to whether Moschetti, the lead investigator in the Martin case, engaged in improper conduct. It concluded she did.  Relying on little more than cherry-picked e-mails from very early in Moschetti's investigation and baseless speculation, Nixon Peabody falsely stated that:

(a) it was "most likely that OSIG's lead investigator [Moschetti] was *impaired* by *personal bias* and that this *bias* likely had an impact on the tone and substance of the OSIG Parole Board Report" (**Exhibit A**, page 3) (emphasis added);

(b) a "high likelihood" existed "that the lead investigator [Moschetti] *was motivated* to see Mr. Martin returned to prison and *such motivation* likely impacted the investigation and report" (**Exhibit A**, page 3) (emphasis added);

(c) "**The Lead Investigator Was Most Likely Biased**" (**Exhibit A**, page 17) (emphasis in original);

(d) "It is most likely that the *objectivity* of [Moschetti] in the VPB Martin matter *was impaired by bias* and *that this bias likely had an impact on the OSIG Parole Board Report*." (**Exhibit A**, page 17) (emphasis added);

(e) Moschetti's report indicated "*bias* and a *certain disdain for the fact that Martin had been granted parole*" (**Exhibit A**, page 18) (emphasis added);

(f) The initial draft reports authored by Moschetti [including reports leaked to the media] included allegations that "were not supported by the evidence" (**Exhibit A**, page 15)

(g) "The most troubling aspect of our review was OSIG's failure to identify *apparent bias in the lead investigator* [Moschetti], which *likely impacted OSIG's*

> ***investigation and report***. . . We will likely never know the extent, to which, ***the lead investigator's likely bias*** impacted the OSIG Parole Board Report." (**Exhibit A**, page 65).

It also falsely implied that Moschetti's alleged bias led her to make false allegations against the Board in her Vincent Martin report. **Exhibit A**.

78. Like the similarly false accusations of bias and the like that had been made months earlier by Mercer and Moran, none of these new statements were true – that is, Moschetti was not biased (personally or otherwise), was not motivated by trying to return Martin to prison, did not have "disdain" for the Parole Board's decision to grant Martin parole, did not let any of her personal feelings a*bout anything* impact, impair, or influence her drafting of her Vincent Martin report, and did not make any false claims about the Board in her report.

79. The Nixon Peabody report listed its statements and implications about Moschetti as findings of fact, the result of Nixon Peabody's extensive witness interviews and its review of more than 8500 documents. *See* **Exhibit A,** pages 27-29.

**K.    THE NIXON PEABODY REPORT SERVES ITS PURPOSE.**

80. Having strictly limited the scope of Nixon Peabody's report, Virginia's Democratic leaders succeeded in getting the report they wanted and needed (from a political perspective.

81. The former Governor's General Counsel all but admitted this to Nixon Peabody, telling her interviewee that part of the impetus for the Nixon Peabody investigation was that "***[a]t least politically***, we needed to investigate how this report got down to a six-page report." (emphasis added).

82.     She also admitted that the need for an investigation was "exacerbated" by Moschetti's public complaint that the August 14, 2020 meeting (discussed earlier herein) was intended to intimidate her.

83.     This latter admission is critical because Moschetti did not make such a public allegation back in August of 2020 – i.e., at the time of the meeting itself.  Instead, she made it when she [Moschetti] filed her initial Whistleblower lawsuit ***in March 2021***. In other words, Moschetti's action of filing her state court whistleblower lawsuit in March of 2021 put a bullseye on her head at the Governor's Office, and this bullseye helped drive the scope and substance of the Nixon Peabody report.

84.     The true purpose of the Nixon Peabody report was immediately revealed by the Governor's Office the day it was released.  At that time, then Governor Northam issued a public statement that all but took a victory lap for his office:

> "The report confirms what we have said all along: the Governor's office had no involvement in the Office of the State Inspector General's investigation or its reports, nor did anyone in the Administration pressure OSIG to reach a different conclusion . .  This report clearly repudiates unsubstantiated allegations repeatedly made by some legislators."

Northam June 14, 2021 Statement.[6]

85.     Such a results-driven scheme also was immediately recognized by Republicans at that time.  As was reported in the media back at that time:

> In a statement, House Minority Leader Todd Gilbert, R-Shenandoah, said the Nixon Peabody report confirmed the GOP's suspicions the review ***was narrowly tailored to find fault with Moschetti instead of taking a comprehensive look at the Parole Board's actions.*** Several other examples have been reported, mainly through other leaked OSIG reports

---

[6]  https://www.wric.com/news/virginia-news/lead-osig-investigator-in-virginia-parole-board-probe-was-most-likely-biased-law-firms-report-concludes/ (visited on April 27, 2023).

the agency and the Northam administration did not release publicly, of the Parole Board failing to give proper notifications to victims and prosecutors as it tried to speed up the release of certain inmates to clear prisons at the onset of the COVID-19 pandemic. Gilbert said the report shows "what $250,000 worth of damage control looks like."

"House Democrats needed a way to discredit the plethora of damning Office of State Inspector General reports into the Parole Board, but they couldn't risk turning over too many stones to do it," Gilbert said. "That's why today's report doesn't reflect a critical look at the Parole Board, but rather scrutiny of OSIG's investigation into the potentially illegal activity at the Parole Board."[7]

June 14, 2021 Article, *see* FN7 (emphasis added).

86.     The Nixon Peabody report also had the added veil of impenetrability because the bill pursuant to which it was authorized specifically designated the report's investigative materials as "confidential" and said that none of the materials could be accessed pursuant to Virginia's Freedom of Information Act.   In other words, Nixon Peabody's conclusions – regardless of their falsity – appeared beyond the reach of any genuine or legitimate scrutiny.

**L.     OAG'S INVESTIGATION AND ITS JANUARY 25, 2023 REPORT.**

87.     The veil of accuracy as to the Nixon Peabody report was pierced, however, when Governor Glenn Youngkin was elected Virginia's Governor in the fall of 2022, together with a Republican Attorney General. Almost immediately after he was sworn into office, Governor Youngkin issued Executive Order 3, which tasked the OAG to investigate the entire scope of the Parole Board scandal from 2020 and 2021, *including Nixon Peabody's investigation.*

---

[7]         https://www.virginiamercury.com/2021/06/14/law-firms-review-finds-va-investigator-was-most-likely-biased-in-parole-board-probe (visited on April 27, 2023).

88.     On January 25, 2023, the Office of the Attorney General issued its report --

called the "Report of Investigation Virginia Parole Board  Pursuant to Governor Executive

Order 3 (2022)"  – pursuant to this executive order and shone a harsh light upon Nixon

Peabody's false allegations against Moschetti.  A copy of the report is attached as **Exhibit**

**B**.

89.     In that report, the OAG disclosed _for the first time_ that the Nixon Peabody

reported was intentionally crafted so as to parrot Mercer's and Moran's prior false attacks

on Moschetti's character and skill as an OSIG investigator and to essentially confirm

previous false accusations (including those made by defendants Mercer and Moran

herein) that Moschetti was biased and lacking in objectivity.  Notably, the report – in bold

print -- stated that:

> **Nixon Peabody's conclusions are unsupported by the evidence.  In fact, Nixon Peabody omitted significant, material information from its final report that skewed the outcome, deprived the public of the truth, and further the partisan narrative that served as the initial basis for the narrow investigation.**

**Exhibit B**, page 52 (emphasis in original).

90.     The Report also debunked the notion that the witness "interviews"

conducted by Nixon Peabody somehow proved that Moschetti was biased or lacking in

objectivity.  The report stated:

> _**Contrary to the findings in Nixon Peabody's final report**_, witnesses interviewed by  Nixon Peabody expressed an _**overwhelming majority view**_ that Jennifer Moschetti and the OSIG investigation into Vincent Martin were _**unbiased and professional**_. Of the 18 witnesses  Nixon Peabody interviewed about OSIG's bias, eleven stated OSIG and Moschetti were unbiased and professional. Only five expressed a belief that the investigation was biased— and four of those were Northam administration appointees.

**Exhibit B**, page 52 (emphasis added).

91.    The OAG report then went even further and showed *how* Nixon Peabody had selectively omitted several key facts that completely undermined its findings about Moschetti, explaining that:

> Michael Westfall, Virginia's Inspector General, told Nixon Peabody that Moschetti did not do or say anything during OSIG's investigation that made him think she was biased. Parole Board Member Kemba Pradia told Nixon Peabody she "[d]id not sense any bias. [It] [s]eemed like they were empathetic on the position that parole board members are in and that the decisions we make are not easy ones." OSIG's legal advisor in the Attorney General's office told Nixon Peabody that "it appear[ed] that the Governor's Office was putting pressure on OSIG" and that OSIG's investigation was "very independent and thorough."

**Exhibit B**, page 52.

92.    In fact, Nixon Peabody's selectivity was even more pronounced than that noted by the OAG's report.  One particularly striking example was the fact that Nixon Peabody in its report totally omitted the statements that Moschetti's former supervisor, Richard Scholl, made when it asked him if he had any concerns or worries about letting Moschetti run the Board investigation since she was a "new hire" and someone who might have close connections to law enforcement.  Rather than taking the bait provided in Nixon Peabody's loaded question, Mr. Scholl summarily rejected such claims and stated he had no such concerns.  He said "Jennifer showed us in her work that ***she was capable and she knew how to run an OSIG investigation based on the stuff we saw from her previously*** and also ***because of her knowledge/background***," and that she "never did or said anything to me that made me think she wouldn't be objective." Nixon Peabody Interview (emphasis added).

24

93.    And in a final statement in the section of its report about Nixon Peabody's prior investigation, the OAG report bluntly stated:

> Nixon Peabody omitted significant amounts of information that contradicted the Northam administration's positions on parole. The Northam administration also found a scapegoat in Jennifer Moschetti, an OSIG employee whose life has been unjustly ruined by partisan politics. Nixon Peabody's concealment of important facts skewed its report by hiding information that was politically harmful to the Northam administration, and ultimately resulted in a $250,000 whitewash using taxpayer money.

**Exhibit B**, page 53 (underscore in original).

94.    Even current Attorney General Miyares called Moschetti a "whistleblower" when publicly discussing the OAG report on its date of publication.

**M.    AFTERMATH.**

95.    The Nixon Peabody report has substantially harmed Moschetti's reputation and especially her ability to obtain employment subsequent to its release.

COUNT I – DEFAMATION:

96.    The allegations of paragraphs 1-95 are realleged as if fully set forth herein.

97.    Moschetti has been defamed by Nixon Peabody's statements from its report that are specifically referenced and previously set forth in paragraph 77(a)-(g) and the last sentence in paragraph 77 of the Complaint, which statements were published and were made with the intent to defame Moschetti.

98.    The statements at issue are false and purport to be statements of fact, not statements of opinion.

99.    Moreover, the false statements all involve the efforts of Nixon Peabody to demean and disparage Moschetti and to falsely accuse her of unprofessional occupational

activities and unfitness to perform the duties of her job, and thus these statements constitute defamation *per se.*

100.    As a proximate cause of the conduct of Nixon Peabody, Moschetti has suffered substantial compensatory damages, including as severe mental and emotional distress, reputational harm, loss of sleep, loss of income, humiliation, embarrassment, loss of time, and other damages.  She is also entitled to presumed damages.

101.    In addition, the false statements made about Moschetti by Nixon Peabody were made intentionally, willfully, and maliciously against Moschetti and with utter and conscious disregard of her rights.

102.    Just as important, Nixon Peabody's defamatory statements were made with *New York Times* "actual malice," which is a necessary element of Moschetti's defamation claim here.  Not only did Nixon Peabody intentionally conceal favorable information and evidence about Moschetti that it learned in its investigation so as to skew its accusations against Moschetti in its report, it did so either knowing that such accusations were false or with a high degree of awareness that its allegations against Moschetti were probably false. Indeed, Nixon Peabody was aware of so many witness statements that directly contradicted its false claims that Moschetti was, *inter alia*, biased, lacking objectivity, and/or otherwise acting with improper motives when she conducted her investigation into the VLM matter that its omission of *any mention of these contrary statements* anywhere in its report must have, upon information and belief, been a conscious decision on its part which was designed to convey a portrait of Moschetti that it knew or must have known was completely false and contrary to the evidence.

103.    Moschetti would never have been able to uncover with reasonable diligence the facts necessary to allege such "actual malice" in the absence of the OAG's January 25,

2023 report.  Indeed, upon information and belief, Nixon Peabody knew full well that there was a high likelihood that it would be able to conceal such facts from Moschetti or members of the public due to the confidential nature of its investigation and the fact that its investigation materials could not be obtained with requests under Virginia's Freedom of Information Act. Simply put, Moschetti had no way to obtain information, in advance of the OAG's January 25, 2023 report, that would show Nixon Peabody's mendacious behavior and sinister intent.

104.    Further, while Moschetti vehemently disagreed with the allegations against her at the time they were initially published, Moschetti, at the time of the report's release, had no choice but to rely on Nixon Peabody's facial representations that it had conducted a thorough investigation.  Nothing in the report itself would have allowed Moschetti to plausibly allege that Nixon Peabody was knowingly skewing its allegations against her and/or ignoring directly contrary evidence that it had *in its possession* when it made its false statements about her. But for Nixon Peabody's intentional omission of such contrary evidence, together with the fact that Moschetti could never have been able to learn about such contrary evidence without the publication of the OAG report, Moschetti would have sued Nixon Peabody for defamation as soon as possible. Moschetti reasonably relied on Nixon Peabody's false portrayal and representations in its report of its own investigative efforts in not bringing this claim for defamation prior to the release of the OAG's report in January of 2023.

105.    Likewise, but for Nixon Peabody's intentional omission of so many contrary witness statements and other evidence, together with the fact that Moschetti could never have been able to learn about such contrary evidence without the publication of the OAG

report, Moschetti could never had known that there was so much "behind the scenes" as to the Nixon Peabody report that would support a claim for defamation.

106.    Finally, no privileges, qualified or absolute, attach to these statements, therefore, and Moschetti is also entitled to punitive damages in this matter.   Indeed, Nixon Peabody's statements not only were contradicted by information it already had in its possession, they were the direct and foreseeable result of the political considerations that went into the actions of strictly limiting the scope of Nixon Peabody's investigation in the first place.

## COUNT II:
### DUE PROCESS VIOLATION: LIBERTY INTEREST

107.    The allegations of paragraphs 1-106 are realleged as if fully set forth herein.

108.    Under the Fourteenth Amendment, Moschetti has a liberty interest to engage in the commonplace occupations of her life and with respect to her good name, reputation, honor, and integrity.

109.    Here, Nixon Peabody, acting under color of state law as an entity conducting an investigation that was specifically directed, funded, and authorized under the auspices of Virginia state law, violated Moschetti's liberty interests by making numerous false statements about her (specifically all of the statements identified in paragraph 77(a)-(g) and the last sentence of paragraph 77), in conjunction with the fact of her prior termination and the lingering damage caused to Moschetti's job opportunities, that Moschetti had, among other things, acted without integrity, honesty, respect, trust, or accountability, in conducting her investigation of the Board and drafting her reports about Board misconduct.

110.    These false accusations impugn Moschetti's good name, honor, reputation, and integrity, thus causing a stigma to her reputation, and were made in connection with the loss of her employment at OSIG.

111.    Additionally, the false statements at issue were made public to, among others, local media outlets.

112.    As a direct result of the actions of Nixon Peabody, in violation of the rights secured to her under Section 1983, Moschetti has been caused to suffer the loss of occupational opportunities and the compensation and benefits associated therewith. Additionally, Moschetti has been caused to suffer personal injury, reputational harm, anxiety, emotional distress, personal humiliation and embarrassment as a result of their actions.

113.    Further, Nixon Peabody's actions constitute gross, wanton, malicious, reckless, and/or intentional violations of Moschetti's rights, thus entitling her to punitive damages.

114.    Finally, Nixon Peabody's negative public comments irreparably poisoned public perception about Moschetti to such a degree that any type of name-clearing hearing or post-deprivation remedy would have been futile or worthless.

## COUNT III:
### FIRST AMENDMENT RETALIATION

115.    The allegations of paragraphs 1-114 are realleged as if fully set forth herein.

116.    Moschetti engaged in protected activities under Section 1983 (through the Fourteenth Amendment of the Constitution) when she exercised her rights under the First Amendment of the Constitution to disclose some of her report materials to members of

the General Assembly on or about March 3, 2021; and (v) to file her Petition seeking Whistle Blower status.

117.    Nixon Peabody was aware of Moschetti's protected activities and/or believed that Moschetti had engaged in such protected activities, and was aware that any retaliation based on such protected activities would violate Moschetti's rights under clearly established law.

118.    Notwithstanding this awareness, Nixon Peabody violated Moschetti's rights under the First Amendment when it publicly impugned her integrity, intimidated her, and essentially threatened her because she disclosed materials to the General Assembly and because she filed her Petition seeking Whistle Blower status.

119.    Nixon Peabody acted with malicious intent to deprive Moschetti of her First Amendment rights, as secured under Section 1983, and to do her injury.

120.    As a direct result of the actions of Nixon Peabody, in violation of the rights secured to Moschetti under Section 1983, Moschetti has been caused to suffer the loss of work, income, and the benefits and compensation associated therewith. Additionally, Moschetti has been caused to suffer personal injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of the Defendants' actions.

121.    Further, Nixon Peabody's actions constitute gross, wanton, malicious, reckless and/or intentional violations of Moschetti's rights, thus entitling her to punitive damages.

**COUNT IV:**
**42 U.S.C. § 1985 CONSPIRACY**
**AND COMMON LAW CONSPIRACY UNDER VIRGINIA LAW**

122.   The allegations of paragraphs 1-121 are realleged as if fully set forth herein.

123.   Moschetti engaged protected activities under Section 1983 (through the Fourteenth Amendment of the Constitution) when she exercised her rights under the First Amendment of the Constitution to disclose some of her report materials to members of the General Assembly on or about March 3, 2021 and to file her Petition seeking Whistle Blower status.

124.   Nixon Peabody was well aware of Moschetti's protected activities and/or believed that Moschetti had engaged in such protected activities, and was aware that any retaliation based on such protected activities would violate Moschetti's rights under clearly established law.

125.   As explained in the allegations in this Complaint (especially Mercer's actions in speaking publicly about Moschetti and his actions with respect to reviewing the bill that ultimately became H.B. 1800 (2021) and Nixon Peabody's intentional skewing of its investigation), Nixon Peabody, Mercer, persons in former Governor Ralph Northam's Office and other Democratic leaders, including Democratic legislators, conspired and/or acted in concert in order to design a so-called independent investigation that would focus solely on the acts of Moschetti as investigator of the Parole Board with respect to the Vincent Martin matter (rather than the actions of the Parole Board itself) and provide political cover for the Parole Board and the Governor in an election year. The investigation was also designed as punishment for Moschetti because she disclosed her draft OSIG reports to the members of the General Assembly and filed her Whistleblower Lawsuit in the Circuit Court for the City of Richmond in March of 2021.

126.    Nixon Peabody acted in furtherance of this conspiracy, particularly with its actions in drafting an intentionally skewed report, and as confirmed by former Governor Northam's post-release statement about the report.

127.    Nixon Peabody acted with malicious intent to deprive Moschetti of her First Amendment rights, as secured under Section 1983, and to do her injury.

128.    As a direct result of the actions of Nixon Peabody in violation of the rights secured to Moschetti under Section 1983 and under Virginia common law, Moschetti has been caused to suffer the loss of work, income, and the benefits and compensation associated therewith. Additionally, Moschetti has been caused to suffer personal injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of these Defendants' actions.

129.    Further, Nixon Peabody's actions constitute gross, wanton, malicious, reckless and/or intentional violations of Moschetti's rights, thus entitling her to punitive damages.

WHEREFORE, Plaintiff requests this Honorable Court to:

a.   Accept jurisdiction of this case;

b.   Award Plaintiff compensatory and presumed damages, including for such things as humiliation, mental and emotional distress, and pain and suffering that she has experienced and endured, as a result of Nixon Peabody's unlawful actions towards her. Such damages shall be in an amount not to exceed FIVE MILLION DOLLARS ($5,000,000.00), the exact amount to be determined at trial;

    c.  Award Plaintiff punitive damages against Nixon Peabody in an amount not to exceed THREE HUNDRED FIFTY THOUSAND DOLLARS ($350,000.00), the exact amount to be determined at trial;

    d.  Grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

    e.  Grant Plaintiff her reasonable expenses, costs and attorneys' fees; and

    f.  Grant such other and further relief as to the Court seems just and proper.

**A TRIAL BY JURY IS DEMANDED**.

Respectfully submitted,

JENNIFER MOSCHETTI

By:     /s/Richard F. Hawkins, III
            Richard F. Hawkins, III, VSB# 40666
            THE HAWKINS LAW FIRM, PC
            2222 Monument Avenue
            Richmond, Virginia 232220
            (804) 308-3040 (telephone)
            (804) 308-3132 (facsimile)
            Email: rhawkins@thehawkinslawfirm.net